## HUNT AND PHILLIPS *v*. ABRAHAM FREEMAN.

*Intention—Mistake—Trust.*

The court of chancery will carry into effect the intention of the parties, where, by fraud or mistake, such intention is not embodied in a written agreement.

A trust executed according to the intention of the parties is good at law, where there is no court of equity to aid it.

THIS was a bill in chancery, prosecuted by the complainants to obtain a decree quieting their possession of section 35, township 4

east, 2d entire range in Symmes' purchase, and to enjoin perpetually execution upon a judgment in ejectment, recovered against them in the supreme court of Warren county, from which court the cause was adjourned for decision here.

The material facts charged in the bill were as follows: On the 16th of July, 1789, Clarkson Freeman, under whom both parties claim, made a contract with J. C. Symmes to purchase of him eight sections of land specifically described, one of which is the land in dispute.

In January, 1790, Freeman agreed with Elias Boudinot for the purchase of six land warrants, for a section of land each, and agreed, upon certain terms and conditions, to locate them in Boudinot's name upon six of the sections purchased of Symmes. The warrants were numbered 235, *236, 237, 238, 239, 240. On [491 the 22d of May, 1790, three of these warrants, numbered 237, 238, 239, were located upon three of the sections as agreed upon; the warrant 239 being located upon section 35, the land in dispute.

In the year 1792, Clarkson Freeman, being in prison in New Jersey for a judgment for a large sum of money, escaped, and in October of the same year he made a power of attorney to his brother, Ezra Freeman, authorizing him to dispose of the lands held upon the six warrants purchased from Boudinot.

The judgment creditor of Clarkson Freeman prosecuted a suit against the sheriff for the escape of Freeman, when, for the purpose of indemnifying the sheriff, on the 7th of December, 1795, an agreement was entered into between Clarkson Freeman, by his attorney, Ezra Freeman, Elias Boudinot, and Aaron Ogden. By this agreement the interest of Clarkson Freeman in three of the sections of land, held upon the warrants purchased of Boudinot, was pledged in trust to Aaron Ogden as trustee, to be sold at certain times and upon certain terms and conditions, to raise the money recovered against the sheriff. The entries being made in the name of Boudinot, he covenants to convey the legal title to Ogden should a sale be required, and Freeman covenants that if payments are not made this shall be done. In this covenant the lands subjected to the trust are described only by the number of the warrants supposed to be located upon them, which are specified as numbers 235, 236, 237, neither of which is located on the section 35 now in dispute.

Immediately after the completion of this arrangement, the com-

plainants, Hunt and Phillips, purchased the judgment against the sheriff, and on the 17th of May, 1796, released it as against the sheriff upon receiving from the trustee a deed declaring the trust.

In September, 1796, the complainants received from Symmes a deed for section 34, covered by warrant 237, for the first installment, which was not then due. This deed was made with the assent of Freeman.

The second installment fell due December 8, 1797; it was not paid, and no measures were taken to execute the trust with respect to it. It remained unpaid, and on the 5th of November, 1798, 492] Symmes conveyed to Boudinot the *sections 34 and 35, neither of them located upon the warrants described in the trust agreement; and on the 5th of December following Boudinot conveyed these two sections to Ogden, under the contract of trust, to be sold to raise the remaining installments, the latter of which would fall due December 8, following. On the 8th of January following, Ogden, in execution of the trust, sold the two sections of land to the complainants. Upon this title the complainants rested their claim.

The defendant claimed under a conveyance duly executed from Symmes to Clarkson Freeman, in September, 1796, for the section 35, and a deed from C. Freeman to himself, dated February 5, 1799.

The bill charged that it was the intention of the parties to cover and secure such sections as had been located, let them be covered by any number of the warrants, provided there were not other sections located more correctly answering the description. It also charged that Ezra Freeman gave assurance at the time the trust agreement was made that all the warrants were regularly located; but that in fact three only of the six warrants were located, and that the other three never were located. The three located warrants covered the three sections sold, including that in dispute.

The principal facts stated in the bill were admitted in the answer. It was silent as to the allegation that Ezra Freeman represented all the warrants as located, and it averred that each of the six warrants was located, and described the land upon which the location was made. It claimed to be a purchase for valuable consideration, but did not deny notice.

Aaron Ogden testified that Ezra Freeman informed him that
496

the warrants were all located, and that the trust contract was entered into under that opinion. That land, and not floating warrants, was understood to be the subject of the contract.

Jon. Dayton testified that Ezra Freeman and A. Ogden requested him to value the lands. That he understood from Ezra Freeman that the warrants were all located, and made the valuation upon that impression.

It was in full proof that two of the warrants named in the *trust agreement, numbers 235 and 236, were not located at [493 the time that agreement was made. The sections upon which the answer alleged that they were located were not of the number sold to Freeman, upon which he contracted with Boudinot to locate them; and besides this, the same section had been conveyed by Symmes to Boudinot before these warrants were located upon them. The time of the location of the other warrant was not explained, nor was it certain that it had been located. The section named in the answer as covered by it was not one of the number sold by Symmes to Freeman, and referred to in the agreement to Boudinot.

Two witnesses testified that so early as 1796 they heard the defendant state that he knew the complainants had a mortgage on the land in dispute.

ESTE, for the complainants:

1. It was manifestly the intention of the parties to the mortgage to pledge three sections of land, and not floating warrants.

This intention is distinctly expressed in the agreement, and is fully proved by the testimony. It is also fully proved that at the time three sections only were located. The intention of the parties can only be carried into effect by subjecting those three sections; and it is a well settled rule that "grants are to be construed according to the intent of the parties." 3 Bacon, 293; 4 Cruise on Real Property, 293, 294; 4 Dall. 347; 3 Johns. 388; 1 Mass. 219.

It is a just inference from the whole testimony that Ezra Freeman, when he gave assurance that all the warrants were located, knew the contrary. He therefore practiced a fraud upon the other parties. This fraud attaches to his principal, who, having led the other party into error, shall not be permitted to allege his own wrong to defeat the operation of his own contract.

2. The contract of trust attached at the time of its creation to

497

this section 35. It was a fraud in C. Freeman, when he knew this, to take the legal title. This fraud can avail him nothing. The complainants purchased the equity, the right upon which the trust operated, at a fair sale, for a fair consideration, and are the right-494] ful owners. In the *hands of C. Freeman this section must be considered the property of the complainants.

3. The present defendant is not an innocent purchaser without notice. Notice of the complainants' claim is brought home to him by the testimony of two witnesses, corroborated by all the circumstances. And besides, notice is not denied. The nature and effect of notice is well understood. 2 Fonb. 143, 150; Sugd. Vend. 484; 4 Mass. 638; 6 Id. 488, 489; 2 Ves. Jr. 437; New. Con. 511; 2 Atk. 54; Hardin, 37; 1 Johns. Ch. 303, 575; 2 Ves. Jr. 454; 9 Ves. 32.

HAMMOND, for the defendant:

Assuming that the case is not varied by the defendant's answer nor by the proof, and considering the case as if the title remained in Clarkson Freeman, the complainants maintain that, as it was the clear intention of the parties to convey land and not warrants, an equitable interest in the land was created by the deed of trust, and that as against Clarkson Freeman the complainants as purchasers, at the trust sale, acquired this equity, upon completing the purchase and paying the purchase money. Admitting all the premises assumed, we think the complainants' conclusion a most obvious *non sequitur.*

Although it were the intention of the parties to convey land, it is very clear that they did not succeed in carrying that intention into effect. The conveyance in this respect is intrinsically defective; it does not perfect the intention of the parties. The deed tripartite never attached upon section 35. The trustee had no power over it under the deed. As to it the deed was inoperative. At the time the trust was created the legal title was in Symmes. The terms used in creating the trust did not touch this section. Before the time limited for the execution of the trust, in any part of it, expired, Symmes vested the legal title in Clarkson Freeman. When the trust was executed, in January, 1799, a complete subsisting legal title for this section, in Clarkson Freeman, was of record in Hamilton county, operating as notice to all the world. The purchasers under the trust purchased nothing but a legal title.

The trustee sold nothing else; had power to sell nothing else; and of consequence the purchasers could acquire nothing else. They *purchased the title sold, such as it was, not a secret [495 equity between the parties, growing out of an intention not expressed in the deed. But admitting that they purchased this equity, what is it?

It was the intention of the parties in making this contract to create a trust upon the section 35 in dispute; but the terms of description used, did not include it, and therefore the conveyance executed did not carry the intention of the parties into effect. But the original contract, upon which the deed tripartite between the parties is founded, created a right which subsisted between them, and which equity will enforce; that equity was to subject this section 35 to the trust created for the payment of the judgment. This trust, thus founded, a court of equity might be called upon to decree and enforce. But certainly a court of chancery can not interfere at once to set up this equity, and to confirm an ineffectual and void attempt to subject the land, by an execution of the trust at law? Had application been made in a reasonable time, it is possible a court of equity would have charged section 35 with the trust, and decreed a sale of it to pay the trust money. This is all that equity could have done at any time. Now it is too late to do that.

If the complainants at the trust sale purchase this equity, they could only purchase it as it existed in the *cestue que trust*. They could not acquire an absolute title to the land, neither could they acquire a right to call upon a court of equity to invest them with that legal title. So that admitting that the purchasers at the trust sale acquired the equity, and that they may now set it up in a court of chancery, still they can now only claim to have it subjected to the trust, and sold upon equitable terms, to refund them the money advanced. This is not asked by the bill, nor is a case made upon which a decree of this character can be founded.

The purchasers at the trust sale, the present complainants, were not the original *cestue que trust*, although they subsequently became the owners of the debt, to secure which, the trust was created. Having purchased the debt and obtained from the trustee a deed declaring the trust, they obtained whatever equitable security was created by the original contract. In their hands this equity acquired no new *character by the purchase under the trust [496

deed.   When they come into a court of chancery to set it up, they can not claim to have it converted into a legal title.   They had, by the original contract, an equitable security for money, and in their hands equity must still consider it such.   They may ask equity to aid in executing the trust.   But they can not ask to have a void effort to execute the trust at law confirmed, and a complete legal title vested in them.   Their situation can be no better than that of a purchaser at the trust sale, who was a stranger to the previous proceedings.   Conceding, therefore, to the complainants the facts they assume, they can not have the relief prayed for.

It is, however, by no means admitted that the whole facts of the case place it upon the ground assumed by the complainants.

The bill charges that it was the intention of the parties to convey lands, and not floating land warrants; and also that it was " *the design of the parties to cover and secure such sections as had then been located, let them be covered by what they might, provided there were not at the time other sections located more correctly answering the description, and that the said Elias was induced principally from that consideration to join in the contract.*"

The bill also charges that at the time of the contract, three only of the six warrants were located, and that the residue have not yet been located.   And that there were no other lands in the Miami Purchase which Boudinot could convey, except the three sections, 24, 34, and 35.

The proof of these allegations are essential to support the complainants' case, and they evidently so considered it, when they charged them in their bill.

It is satisfactorily proven that it was the intention of the parties to create a trust upon land, and not upon floating land warrants.   But this proof is not enough.   The parties in the deed have described the lands they meant to convey, and proof of the fact that they meant to convey land, is not sufficient to sustain an allegation that they meant to convey any other particular tract.   Every conveyance of land imports of itself an intention to convey land and not floating evidence of title; but where one tract is specially described in the deed, this general evidence of an intention to convey *land can not authorize a court of equity to decree the conveyance of any other specific tract not described in the deed.   Possibly this might be done where a clear intention

to convey a tract different from that described in the deed is made
out in evidence. But that is not the case here.

The complainants rely upon the depositions of Boudinot, Ogden,
and Dayton to prove this intention. Their evidence goes no
further than the deed itself, which clearly evidences an intention
to convey land. Boudinot says nothing about the intention.
Ogden says the intention was to convey lands, and adds, "naming
the numbers of the warrants in the contract, was not the result of
a choice or preference, *but merely to designate which of the located
sections should be taken.*" This falls far short of sustaining the al-
legation in the bill, that it was the design of the parties "*to cover
such sections as might be then located, let them be covered by what they
might.*" Here was a positive intention to designate particularly,
and not a word about a design to include other than the desig-
nated lands. Dayton is equally silent as to the fact of an under-
standing or design, in regard to located lands, except that lands
and not warrants was the subject of the contract, and this is evi-
dent from the contract itself. The complainants' case is not
strengthened by these depositions. They prove no material fact
whatever.

The case of Russell v. The Trustees of the Transylvania Univer-
sity, 1 Wheaton, 438, is, in all its essential points, similar to this.
The complainants alleged, in that case, that the grantor conveyed
one tract of land, when he intended to convey another. They al-
leged a mistake in carrying the intention into effect, and sought
to rectify it. They set out that the grantor had but one tract in
the block of surveys, one of which was conveyed, and that it was
the design to convey the tract to which he had title, not that to
which he had none. They alleged, also, that he derived title
under a particular warrant, and they alleged, as is alleged in this
case, that it was the intention of the parties to the deed, that it
should pass the two thousand acre survey, by whatever boundary
described, to which the grantor was entitled under the warrant.
The court held that without full and explicit proof of this latter
circumstance they could not interfere; *even then they only [498
say, " it is *possible* the court might be induced to think the plaint-
iff's case a good one."

As the intention to convey located lands is made out, it is ar-
gued that a mere unintentional error ought not to *destroy* the se-
curity intended. This argument would be worth something, were

the bill prosecuted by the *cestui que trust* to set up the security. But it has no application here. It admits that the trust did not, at law, attach to the land in dispute, and the purchasers under the trust at law, purchased nothing but that upon which the trust deed operated. The mistaken notion that notwithstanding the mistake, the deed was really as operative as if no mistake existed, that the purchaser of the supposed legal title could claim in equity all that the *cestui que trust* might have claimed, has confused the complainants throughout. The same error must have confused others, or this cause, in its present shape, could not have remained so long in court.

But even between the original parties the consequence of this mistake could not be that which the complainants insist upon. It could not entitle them to fasten the trust upon other lands than those described, unless it be shown that such other lands were really the subject of the contract. That lands were intended to be conveyed, and were not, would be a good reason for avoiding the contract in equity, but would be no sufficient reason for attaching it to any land, owned by the grantor, under warrants purchased of Boudinot, much less could that circumstance authorize the *cestui que trusts* to choose whether they would take 27 or 35. If it were in evidence that the section 35 was one actually contemplated by the parties; that it was one of the sections actually valued by Dayton, and that the parties supposed they had described it in the deed, then there is no doubt but that equity would secure it to the *cestui que trust.* If it were in proof that the trustees sold, and the plaintiffs purchased, section 35 without having discovered the mistake and under the belief that it was properly described, there could be no doubt about the case. But this is not pretended. The bill disavows any contract for a particular section, and goes for whatever sections might be located, and if more than three, then for a choice. It is claimed to make the tripartite **499]** contract, confined in its terms to specific numbers, a *floating conveyance, to be fastened down upon such tracts as may best suit the views of the *cestui que trusts.* This, we say, can not be done. So much of the tripartite contract as fairly bears the character which the complainants give it, is void for uncertainty.

The complainants claim that Abraham Freeman is a purchaser with notice, and stands in the same situation that Clarkson Freeman himself would stand. Whatever the facts in the case might

make out on this point, we must concede that upon the answer, the case is not so made that the defendant can protect himself as a purchaser.

ESTE, in reply:

It is admitted that land, and not floating warrants, was the subject of the contract of trust. Three sections were pledged—three sections only were located. If Ezra Freeman meant to act honestly, his intention must have been to mortgage these sections. The intention of all the parties was a pledge of land. These three sections only could be pledged, and therefore the trustee had a right to fasten the trust upon them.

The case cited by the defendant's counsel from 1 Wheaton, we think, is in favor of the complainants.

It is true in that case it is stated that the grantor intended to convey one tract of land, and by mistake conveyed another; but it is manifest that the case turned upon the question whether there was *sufficient evidence of that intention.* If this intention had been made clear, notwithstanding the great reluctance avowed by the court, from the antiquity of the transaction, to inquire into the intention, there can be no doubt that a decree would have been rendered for the complainants. The court say that "the whole equity of the complainants must depend upon the alleged intention of the parties at the time of the conveyance." "And here," they say, "we find the case wholly unsupported by proof." That there was nothing like it to be found in the deed, in the answer, or in the extrinsic evidence in the cause. But in the case before the court, clear and satisfactory evidence has been produced of the intention alleged in the bill. In that case there was no proof—here it is conclusive.

*But the defendant's counsel insists, that if section 35 was [500 pledged, the complainants did not purchase the equitable title at the trust sale.

The trustee was authorized to sell *all the interest,* whatever it might be, that Clarkson Freeman had in section 35. It is true that it was expected that Judge Symmes would make a deed to the trustee before the sale, so that the whole title, legal and equitable, might be sold if the payment were not made. Such a deed was made, but not until after one had been executed to Clarkson Freeman. If the deed to C. Freeman had not been made, the pur-

chasers at the trust sale would have acquired the whole title; but the legal title passing to C. Freeman after the contract, only made him a trustee for the purchaser at the sale. At the time of the contract he had only the equitable title, and if the legal title had not passed from Judge Symmes, the sale could have been made by the trustee of *all the rights* of C. Freeman to the section, and Judge Symmes would have held the legal title in trust for the purchaser.

It is contended that if the equitable title were sold, the whole of that equity was the right to charge section 35 with the payment of the debt—that they have no other right than the original *cestui que trust*—that they acquired no additional right by the purchase—and that, consequently they can not call on a court of equity to invest them with the legal title. In reply it is urged, that the contract was *not only a security* for the payment of the debt, but contained *a power to sell* on failure to pay. This power was exercised without question with respect to the two sections, the legal title to which was vested in the trustee. It would not be pretended that it was necessary for application to be made to chancery to charge sections 24 and 34 for the payment of the debt. But C. Freeman had as good a right to authorize his interest in section 35 to be sold as the other sections, and the mere circumstance of the legal title subsequently passing to himself, can not possibly alter the case. If, in addition to the security for the debt, there had not been coupled a power to sell, the argument of the defendant's counsel would have been unanswerable. But C. Freeman made A. Ogden his agent to sell all his title to section 35, 501] on a certain contingency; that took place, and the *complainants, the representatives of the original *cestui que trust*, became the purchasers. Before the defendant, then, can resist our claim with success, he must show that the owner of an equitable interest can not sell the same so that the purchaser can call upon the holder of the legal title for a conveyance; for the complainants have all the equity that the *cestui que trust* and C. Freeman ever had to the section. The moment the sale was made C. Freeman held the legal title in trust for the purchasers. The sale was fairly made, a valuable consideration paid, and the whole business transacted by an agent fully and legally empowered. Why, then, have not the purchasers a right to call on a court of chancery to invest them with the legal title?

504

· By the COURT:

There is no doubt but that it was the intention of the parties to the contract creating the trust, upon which the complainants found their title, to subject lands and not floating warrants. This is manifest· from the whole testimony, and the reasons why the numbers of the warrants was adopted by way of description is obvious. Freeman had agreed to locate the warrants upon six out of eight specified sections. Proceeding upon the ground that all the warrants were located, but the parties not being informed of the six sections they covered, this mode of description was the best within their reach. If the warrants had been all located, as Ezra Freeman asserted, the description would have been sufficient. That it was defective, is to be attributed to the mistake or the fraud of Ezra Freeman, and is in no respect the fault of the other parties.

The intention of the parties to describe particular and distinct tracts of land was not carried into effect by the writing executed between them in consequence of a common mistake. The defendant can not ask to place the case upon fairer ground than this, because if Ezra Freeman was not mistaken, when he assured the other parties that all the warrants were located, he was guilty of misrepresentation and fraud; which is a more unfavorable view than attributing it to a common mistake.

The mistake was that three only of the six warrants were located, and of these three, one only of those upon which *the [502 trust was given, the other two were still unappropriated. It is not to be doubted ·that upon the discovery of this fact, a court of equity would have charged the trust upon the three located sections, because in so doing they would do nothing but perfect the original object and intention of the parties. It would be ·but correcting the mistake into which the parties fell from a deficiency of correct information at the time the contract was executed between them.

When this matter was transacted there was no court of chancery in this country where the lands lie to take cognizance of the case. And if there was a court of chancery in New Jersey, neither the party nor the subject was within its jurisdiction; the parties, therefore, could only proceed to do that which a court of chancery would direct to be done, and when the rights of the parties were thus fixed, rely upon a court of law to sustain them.

As the property upon which this trust was created was cir-
cumstanced, the parties did not require the aid of a court of
chancery, and this aid could at no time have become necessary
had not Clarkson Freeman obtained a deed from Symmes in viola-
tion of the original agreement with Boudinot. By that agreement
the control of the legal title to the whole six warrants, or the lands
they covered, remained in Boudinot to be transferred to Freeman
upon the performance of certain acts. Boudinot having a right
to control the title to the whole, had covenanted to convey three
that they might be subjected to a particular trust. It rested with
him to carry the intention of all concerned, in the trust agree-
ment, into effect, by conveying any of the sections located, in the
execution of the trust, when it was ascertained that those desig-
nated were not appropriated. It was his duty to retain his con-
trol over three sections of the land, if there were so many secured,
to satisfy the trust. In the actual case a court of chancery would
have enjoined him from parting with this control had he at-
tempted to do it. He might properly, notwithstanding the mis-
take in the description, have conveyed the three located sections
to Ogden, and it would have been a good execution of the trust
agreement on his part. No court of chancery, upon the applica-
tion of Freeman, would have interfered, upon the case as it stood,
503] to restrain Boudinot from thus proceeding; and such a *pro-
ceeding must have been subsequently sanctioned by a court of
law.

When Clarkson Freeman obtained the conveyance from Symmes
for section 35, he knew that it was one of the three located sec-
tions which his agent had agreed should be subjected to the trust.
He knew there was no other land upon which the trust agreement
could operate, and it was a fraud upon that agreement to take the
legal title to himself so as to exclude the agreement from oper-
ating upon it. It was also a fraud upon Boudinot, in whom, by
Freeman's own contract, the control of the legal title was to re-
main. By this fraud, as against those upon whom it was prac-
ticed, Clarkson Freeman acquired no beneficial interest. The
title passed to him, but the subject remained liable to the control
of Boudinot, under both the original and trust contracts. And it
was competent for Boudinot, in the execution of the trust, to
enable Ogden to sell actual ownership, though not the naked
legal title to the land. And in a country where there was no court

of chancery, a court of law would enforce the validity of the sale by giving the purchaser the possession, and regarding the beneficial ownership as superior to the naked legal title.

It is the opinion of the court that the trust attached upon the three located sections at the moment of executing the trust contract, and that the power to execute this trust was not defeated, or in any degree impaired by the conveyance of Symmes to Clarkson Freeman, which, in respect to the trust, was fraudulent and void. The trust was well performed according to law at the time, and the purchasers at the trust sale became the owners of the land. They are well entitled to the possession, and also to have the legal title united with that possession, such as it exists in the hands of Freeman. A perpetual injunction and a conveyance is decreed.

Judge BURNET, having been at one time counsel for Hunt and Phillips, did not sit in this cause.

---

*GEORGE HOUGH *v.* DAVID YOUNG.            [504

*Voluntary Undertaking—Variance—Damages.*

A plaintiff can not support his action by proof contradicting the averments in his own declaration.

The day may be made material by averments.

Damages must be founded upon evidence.

THIS was an action on the case against the defendant, who was cashier of the Zanesville Canal Bank. Its object was to charge the defendant for negligence in so protesting a note left with him for collection, and to take the steps necessary to charge the indorser, that the indorser was not charged.

The cause was tried before the supreme court of Muskingum county, and a verdict given for the full amount of the note. At the trial the court instructed the jury that "the plaintiff was entitled to recover, and that there being no evidence of the ability or inability of the maker of the note, nor any other evidence to show the extent of the plaintiff's injury, the jury, in estimating